## TEMPLE v. LITTLEHALE.

**Patent Appeal No. 4568.**

Court of Customs and Patent Appeals.

Feb. 24, 1942.

Brown, Critchlow & Flick, of Pittsburgh, Pa. (Frank E. Foote and Fulton B. Flick, both of Pittsburgh, Pa., of counsel), for appellant.

W. Saxton Seward, of New York City, for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

Appellant has here appealed from a decision of the Board of Appeals of the United States Patent Office in an interference proceeding reversing so much of the decision of the Examiner of Interferences as awarded priority of invention to appellant of the subject matter of counts 1, 2 and 3 of the interference. The decision of the Examiner of Interferences was also reversed with respect to the subject matter of count 9, which the examiner had awarded to appellant, but that count is not involved in this appeal.

The interference is between an application of appellant filed March 30, 1936, serial No. 71,694, stated in the application to be a division of his application serial No. 668,371, filed April 23, 1933 (now patent No. 2,038,913), and a patent to appellee, No. 2,008,362, issued on July 16, 1935, upon an application filed January 27, 1933, serial No. 653,882.

Count 1 is illustrative of the subject matter in issue and reads as follows: "1. A tool for performing work on metal or other material comprising a barrel, a working element adapted to be inserted into one end of the barrel and removed from the other end thereof with each operation of the tool, means for exploding a charge of material to actuate said working element, and means serving to position the material upon which work is to be performed with respect to said barrel and adapted to limit movement of the working element in the direction in which it passes through said barrel."

Before proceeding with a discussion of the case, we would observe that the decisions of the Board of Appeals, the Examiner of Interferences, and the Primary Examiner do not appear in the record as such; but there is in the record a document entitled "Stipulated Precipe for Appeal Record" in which is contained what is stated to be pertinent parts of such decisions. This stipulated record is not in compliance with our rules. Our rule XXV, paragraph 3(e), provides: "(e) Further to reduce the costs of appeals, it shall be permissible for counsel for the respective parties, subject to the approval of the Commissioner of Patents, to agree upon a statement of the facts of the case, setting forth the questions raised on appeal and so much only of the evidence as may be necessary to a decision of such question. Such statement shall be in duplicate signed by counsel for the parties and filed with the Commissioner of Patents. * * *" 35 U.S.C.A. Appendix.

Obviously, the foregoing does not permit stipulated excerpts from the decisions of the Patent Office tribunals. All of such decisions relating to the issues before us should be certified to us in the form rendered.

Each of the counts before us was copied by appellant from appellee's patent. After the declaration of the interference, and within the motion period, appellee moved to dissolve the same upon the ground that appellant's application does not support the counts in issue, and further that certain amendments to appellant's specification constituted new matter.

The invention involved in the counts relates to a tool for performing work upon metal by explosively driving a projectile or working element through a barrel into engagement with the work.

With respect to the working element of appellee's device the patent states:

"The working element may take various form(s) depending upon the character of the work to be performed. In splicing cables, I usually use a cylindrical bolt or projectile such as that shown in Figs. 1 and 9, provided with an annular groove 15 which serves to retain the working element in the cartridge shell during transportation and handling. The end of the shell is provided with an inwardly turned flange engaging the recess 15. However, the working element may be carried by the cartridge in any other suitable way. I have found it possible, with the construction described above, to use the same working element over and over again by merely inserting the element into the end of a

charged cartridge. I generally crimp the end of the cartridge into the recess 15 to prevent the working element from being lost but this precaution is not essential to successful operation.

"In order to provide means for identifying the operator or the tool used, the end of the working element may have a figure, letter or design formed thereon so that upon engaging the work the design is impressed in the metal. For various purposes and particularly when the tool is used for punching holes of irregular shape in the material operated upon, the working element may be given any desired shape or configuration consistent with the use thereof in a tool of this character."

The patent also states: "In each of the forms of the invention described above it is preferable that the bullet or working element, when it comes to rest in engagement with the work, or the working element in the case of the structure shown in Fig. 10, shall not pass completely out of the end of the barrel. As shown in Fig. 9 the working element, upon engagement with the cable splicing elements 63 and 64, is brought to rest with the rearward portion of the working element extending a distance of one-eighth to three-sixteenths of an inch into the barrel. * * *"

With respect to the use of the tool for splicing cables the patent states: "In splicing cables with the tool described above the ends of the cable 64 are inserted into a soft copper sleeve 63, as shown in Fig. 9. The tool is loaded by raising the locking arm 21 and moving the barrel forward to permit the insertion of a cartridge carrying the working element into the rear of the barrel or explosion chamber. The size, shape, and weight of the working element, as well as the charge of powder or other explosive material used, are chosen in each case to effect the desired operation on the work. In some instances I may use an ordinary loaded cartridge such as that used in ordinary fire arms instead of specially formed working elements. However, for cable splicing operations the use of pointed, lead or jacketed bullets is usually less satisfactory than the use of a flat nosed, steel working element of the form illustrated."

Appellant's application as originally filed states in part:

"The invention, which has an especially important use in forming electrical connections, resides generally in driving an element into one or both of the members to be joined under the impulse created by a confined explosive charge.

* * *

"One of the objects of the present invention is the provision of improved means for forcing a projectile-like member into a solid bond to thereby expand it to a point where a substantially perfect connection will be obtained.

"In its broader aspect, however, the instant invention contemplates the provision of means for securing male and female members together by driving a projectile into the male and/or the female member under high velocity. The projectile may penetrate only the male member, thereby expanding its sides against the aperture in the female member, or it may penetrate both members, the perfect connection being obtained as a result of the expansion. In any event, the penetrating action causes the members to expand and by so doing affixes them together under great pressure through the lateral expansion of the materials."

The structure disclosed in appellant's application is described in the excerpt from the decision of the Examiner of Interferences, which description, omitting reference numerals, reads as follows: " * * * A C-shaped anvil member is threaded to a barrel and is adapted to hold the parts to be operated upon against the muzzle thereof. A breech block, provided with a firing pin, is threaded to the other end of the barrel. The cartridge used by Temple comprises a detonator block, a cup-shaped piston, and a pointed projectile, held together by a threaded screw. In operating the device the firing pin is struck to detonate the cap in the detonator block and thus ignite a charge located in the chamber between the block and piston. The increasing pressure in this chamber finally breaks the screw, permitting the piston, projectile and a portion of the screw to travel down the barrel. The projectile penetrates the parts to be united until the piston engages and is stopped by those parts, whereupon the projectile is separated from the piston and imbeds itself somewhat further in the parts operated upon. * * *"

The said excerpt further states: " * * * The cup shaped piston indents the work to some extent and is held in the barrel until the bonded parts are removed, when it can be extracted from the muzzle. The cup may be used repeatedly by assem-

bling it with a new screw, projectile, and explosive charge. * * * "

With respect to the statement last above quoted, we would observe that there is nothing in appellant's application as originally filed to indicate that the cup-shaped piston indents the work to any extent, or that the cup-shaped piston may be used repeatedly by assembling it with a new screw, projectile, and explosive charge. However, many months after the application was filed, amendments were made to the specification setting forth the foregoing functions of the device.

The Primary Examiner, in denying appellee's motion to dissolve the interference, held that the working member in appellant's device was the cup-shaped piston, and that, so considered, appellant's application supports the counts.

Testimony was taken by both parties, and stipulated excerpts therefrom are contained in the record.

In view of such testimony the Examiner of Interferences on final hearing considered appellee's contention that appellant had no right to make the claims corresponding to the counts here involved. We quote from the excerpt from his decision found in the record:

"Littlehale also urges that Temple has no right to make the counts. His contentions have been adversely ruled upon by the primary examiner in the interlocutory motion referred to at the beginning of this decision, but it is urged that testimony has been presented which would justify the examiner of interferences reinvestigating the matter. The testimony relied upon is for the most part quoted on pages 26 and 27 of Littlehale's brief, and comprises statements by engineers of the Brooklyn Edison Company that the deformation caused by the piston cup (137 in the Temple application) was thought not to play an appreciable part in the effectiveness of the joint. Such testimony is in the nature of opinion (Cf. Schultz v. Dunham, 401 O. G. 719; 1930 C.D. 11). Moreover, it perhaps might be due to the particular interest placed on the idea of the penetrating element which was viewed as a development of the company (Cf. Seeley, X.Q. 31) although cartridges having such an element had been used long before by Temple.

"It does not appear, moreover, that the primary examiner was laboring under any misconception as to the difference of indentation (which would at most be one of degree) between the piston cup of Temple and the projectile of Littlehale. Accordingly, it is not believed that the testimony referred to by Littlehale would justify this tribunal in disturbing the ruling of the primary examiner that Temple can make the counts. * * * "

We would observe that the testimony referred to in the above quotation is not contained in the record.

Upon appeal the Board of Appeals reversed the decision of the Examiner of Interferences. It held that appellant's disclosure does not support the counts before us and awarded priority of invention of the subject matter of said counts to appellee. The Board of Appeals in its decision stated:

"Coming now to the question of whether the Temple application supports the counts involved in this appeal and taking up first counts 1, 2 and 3, it appears that the controlling feature is, what constitutes 'a working element' in the Temple disclosure. This term we believe to be so broad as to be substantially indefinite unless considered in connection with other matter. It is considered, therefore, that this is an instance in which it is proper to inspect the application where the term originated in order to determine its meaning. In the Littlehale application, where the counts originated, there appears to be no question but that the applicant employed this term as another name for projectile and that when he was referring to this element, he meant the entire part which is moved through the barrel by the explosion, including the tip portion which engaged the work. It is our view, therefore, that this term, when applied to the Temple device, includes the cup-shaped member 64 together with the penetrating member 60, and the portion of the screw member which connects these two parts together.

"We shall now consider the clause occurring directly after the term 'a working element,' which is as follows: 'adapted to be inserted into one end of the barrel and removed from the other end thereof with each operation of the tool.'

"There is no description in the Temple application of reusing either the cap member 64 or the penetrating element 60. While it seems probable that, after the penetrating member is removed from the seal as referred to in the description in connection with Fig. 12, this member could be reunited with the cup member by em-

ploying a new screw connection and the thus reassembled 'working element' could be inserted in one end of the barrel at each operation. This, however, is a matter of speculation as possibly both portions of the working element would be affected by the first explosion in such a manner that they would not be suitable for reuse. Furthermore, the screw stub could not be reused. In other words, the same complete 'working element' could not be again inserted in the barrel at each operation. It is our opinion, therefore, that the language of counts 1, 2 and 3 when given the obvious and usual meaning, does not fairly read upon the disclosure of the party Temple."

It is apparent from the foregoing that the only question before us is the right of appellant to make the claims corresponding to counts 1, 2 and 3.

There is only one element of the counts which is in controversy. That element in each of the counts is identically stated and reads as follows: " * * * a working element adapted to be inserted into one end of the barrel and removed from the other end thereof with each operation of the tool * * *."

As we construe the phraseology of this element, it requires that at the end of each operation some portion of the working element remains in the barrel of the tool, and that it, the working element, must be of such a character that it can be removed from the barrel and may again be employed for another operation of the tool.

Appellant admits that his written specification, as originally filed, does not describe a working element adapted to be inserted into one end of the barrel and removed from the other end thereof with each operation of the tool, but his contention is that the features not described are inherent in what is disclosed in his patent application. Of course, if this contention can be sustained, appellant has the right to make the claims corresponding to the counts.

However, it must clearly appear that the elements not described are inherent in the structure which is described in an application.

In the case of Hansgirg v. Kemmer, 102 F.2d 212, 214, 26 C.C.P.A., Patents, 937, we said: " * * * Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing *may* result from a given set of circumstances is not sufficient. * * *"

In our discussion of the merits of the case at bar the first matter to be determined is the meaning of the term "working element" in the counts.

This, standing alone, is a broad and indefinite term, and appellant concedes that it is proper to examine appellee's patent, where the counts originated, to determine the meaning of this term.

It is clear from appellee's patent that his working element is his projectile alone, and that the term "working element" as there used means an element which works upon metals.

Therefore, in considering appellant's disclosure, in order to sustain appellant's contention we must restrict the working element shown by him to one which works upon metals.

The Primary Examiner and the Examiner of Interferences found that the piston cup of appellant's device worked upon the metal to be treated in that, after the explosion, while the projectile was imbedded in the metal to be worked upon, the piston cup struck that part of the metal next to the end of the barrel and deformed it at least to some extent.

We are not in accord with this view, and apparently the Board of Appeals disagreed therewith. While appellant describes his projectile as being composed of highly tempered steel, nothing is said in his application respecting the composition of his piston cup. While it is undoubtedly intended to be composed of metal, such metal might be softer or harder than the metal to be worked upon, and it is not at all clear that the metal to be worked upon would be at all deformed or otherwise affected by the impact of the piston cup thereon.

Appellant contends that fig. 9 of his drawings discloses that his piston cup does deform the metal worked upon. Fig. 9 shows the position of the projectile after it has penetrated the bond. This figure does disclose what might be regarded as some upsetting of the bond where the cup strikes it. The drawing also shows a deformation of the bond opposite the point of entry of the projectile, but such deformation is clearly caused by the projectile alone. Figure 10 of the drawings shows the result of firing the projectile into the bond from the side of the bond opposite to that which is penetrated in figure 9; but figure 10 shows exactly the same upsetting

of material on the side of the bond which, in figure 10, is *not* struck by the cup. An examination of figures 1 and 2 would seem to indicate that such upsetting of material as is shown in figure 9 could not occur; but in any event, we must conclude that such deformation, if it occurs at all, is caused by the projectile alone.

■ While an amendment was made to appellant's specification long after its filing date setting forth that the piston cup striking the end of the bond serves to compact the metal and perform work thereon, we find no warrant whatever for this statement in appellant's application as originally filed, and for that reason said amendment is not entitled to any consideration in this interference. Furthermore, it was stipulated by the parties that the issue in this proceeding is whether the disclosure of Temple's application as filed supports counts 1 to 3, inclusive, involved in this appeal.

Indeed appellant, while stressing the fact that the Primary Examiner and the Examiner of Interferences found that his application supports the counts, does not seriously argue here that his working element, that is, the element working upon metal, is his piston cup; on the contrary, he contends that primarily his projectile is his working element. With this view we are in agreement, and we are convinced that appellant's working element, like that of appellee, is the projectile which normally in appellant's conception is imbedded in the metal to be worked upon, while in appellee's conception the projectile normally only indents or deforms the metal.

The Board of Appeals was of the view apparently that appellant's working element was the combination of the projectile, the piston cup, and the screw connecting the two elements, and that as the screw was broken in each operation of the tool, the entire working element could not be removed from the end of the barrel and again used. Moreover, the board was of the opinion that both end portions of appellant's working element might be so affected by the first explosion that they would not be suitable for reuse.

It is our view that the working element disclosed by appellant is his projectile, as the projectile disclosed by appellee is his working element, for the reason that in appellant's application as originally filed it is only the projectile which works upon metal. Appellant's application states that

the projectile disclosed by him is preferably of finely tempered steel, while appellee's application states that the projectile disclosed by him is preferably made of steel. Therefore, in so far as deforming the projectile by the force exerted by the explosion is concerned, this is no more likely to occur in appellant's device than in the device of appellee.

There remains the question of whether appellant's working element is adapted to be removed from the end of the barrel *after each operation*—in other words, whether it is adapted to reuse.

In this respect appellant's projectile or working element differs from appellee's projectile in that in the former a screw is employed to connect the projectile, the piston cup, and the detonator block, which screw has a recess or annular groove in the portion between the closed end of the piston cup and the detonator block to facilitate the breaking of the screw when sufficient pressure has been built up by the explosive gases.

It appears from appellant's application that this screw is threaded into the butt end of the projectile, threaded through the piston cup, and threaded into the end of the detonator block. Therefore the breaking of the screw at the point of its recess would not release the projectile from the piston cup for the screw would still be threaded into the cup and into the projectile. Nothing is said in appellant's application about a second breaking of the screw, but it is clearly implied therein that the cup and projectile are separated in some way after the explosion. The application states that when the screw is broken "the projectile moves forward and into the bond, the cup being stopped when it strikes the end of the bond." The application further states that the lower end of the opening of the barrel "is slightly tapered * * * to aid in the removal of the *cup portion* of the projectile hereinafter described, after the detonation." (Italics ours.) Nothing is said in the application respecting the removal of the *projectile* from the barrel.

Moreover, the drawings of appellant's application show the projectile imbedded in the work, clearly indicating that the projectile has in some manner become separated from the cup. How this separation occurs is a matter of speculation, but presumably the impact of the projectile upon the work causes a second break in the

screw resulting in the separation of the projectile from the cup.

 Appellant's amendments, concerning which appellee made the allegation that they constituted new matter, may be considered as evidencing appellant's own construction of his original application. One of such amendments states: "It will be evident that the working elements, namely the projectile 60 and the cup 64, are inserted at one end of the barrel 51 and are removed from the other end thereof with each operation of the tool. The cup 64 may be used repeatedly by assembling it with a *new screw, projectile and explosive charge,* if this be desirable." (Italics ours.)

It will be observed from this amendment, first, that according to appellant's construction of his application the projectile and the cup were in some manner separated after the explosion; it is not stated that the projectile may be repeatedly used, but just that the cup may be again used. Indeed, it would seem to be implied in this amendment that appellant did not regard his projectile as capable of reuse since the amendment recites that the *old cup* may be used again by assembling it "with a *new* screw, *projectile* and explosive charge." (Italics ours.)

The counts require that the entire working element be adapted to be removed from the barrel after each operation of the tool; therefore, under appellant's construction of his application, merely removing the cup after each operation of the tool would not support the counts unless the cup be regarded as a working element in itself, which, as hereinbefore indicated, is not disclosed in appellant's application as being inherent in his structure, nor is it otherwise disclosed therein.

It is true that appellant testified as follows: " * * * In the specific operation, the tensile strength in the joint is obtained greatly by the stud. The conductivity is obtained mostly by the indent that the piston has transferred to the connector and it is a combination of the two that gives the tensile strength and the conductivity which we have been able to obtain in this specific joint."

While appellant does not mention this testimony in his brief or seem to rely upon it, even if we assume that in certain operations the cup does indent the metal in its conjoint use with the projectile, it would mean that appellant's working element should be regarded as consisting of both his cup and projectile. As hereinafter noted, appellant's disclosure, when so construed, does not satisfy the counts.

Assuming for purposes of discussion that appellant's projectile and cup together constitute his working element, then the screw connecting the projectile and cup must likewise be considered a part of the working element, as the Board of Appeals indicated; and appellant admits that the screw could not be reused. Therefore, if the combined projectile, cup and screw be considered as appellant's working element, his application does not support the counts.

However, considering appellant's projectile as his working element, it is not clear from his application that the projectile could be used, if desirable, after each operation. It is true that appellant testified that he had experimentally reused both his piston cup and projectile many times by removing the used portion of the screw. He testified that he dug the projectile out of the work in which it was imbedded. He did not testify, however, in what manner he removed the broken screw, or how difficult an operation it consisted of. If the screw was broken flush with the butt end of the projectile, that is, at the point where the projectile and cup abutted, which would seem to be necessary since a separation of the cup and projectile is contemplated, it would be difficult to remove that portion of the screw remaining in the projectile.

██ While the counts must be broadly interpreted, we think that they fairly require that the working element must be adapted to be reused, if desirable, after each operation, in substantially the condition in which it is found after each operation is performed.

█ That this may be done does not appear from appellant's application, and this element of the counts is not inherent in the structure disclosed by appellant.

For the reasons stated, the decision of the Board of Appeals is affirmed.

Affirmed.